ORIGINAL

APPROVED: _____

SHANE T. STANSBURY / ILAN GRAFF
Assistant United States Attorneys

BEFORE: THE HONORABLE DEBRA FREEMAN
United States Magistrate Judge
Southern District of New York

16 MAG 1398

- - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                    :        **SEALED COMPLAINT**

             - v -                         :        Violations of:
18 U.S.C. §§ 1201(a)(1), 1201(c), 1203,
Mohamed Tahlil Mohamed,                     :        924(c), 924(o), 3238, and 2
    a/k/a "Tahlil Mohamed,"
    a/k/a "Mohamed Tahlil,"                  :
    a/k/a "Maxamed Tahliil Guure,"
    a/k/a "the Taliye,"                      :
    a/k/a "Mohamed the Taliye,"
                              :

                    Defendant.        :

- - - - - - - - - - - - - - - - - - - - - - - - - - x

SOUTHERN DISTRICT OF NEW YORK, ss.:

    KEVIN PONDER, being duly sworn, deposes and says that he is a Special Agent of the Federal Bureau of Investigation ("FBI"), and charges as follows:

### COUNT ONE: KIDNAPPING

    1.    From in or about January 2012, up to and including in or about May 2012, in an offense begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, using a means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, willfully and knowingly did seize, confine, inveigle, decoy, kidnap, abduct, carry away and hold for ransom, reward and otherwise another person, and aided and abetted the same, to wit, the defendant and others known and unknown, abducted a citizen of the United States in Somalia and held him/her for ransom.

    (Title 18, United States Code, Sections 1201(a)(1), 3238, and 2.)

1

## COUNT TWO: KIDNAPPING CONSPIRACY

2.      From in or about January 2012, up to and including in or about February 2015, in an offense begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, using a means, facility, and instrumentality of interstate and foreign commerce in committing and in furtherance of the commission of the offense, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 1201(a)(1).

3.      It was a part and an object of the conspiracy that MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and others known and unknown, would and did seize, confine, inveigle, decoy, kidnap, abduct, carry away and hold for ransom and reward and otherwise another person.

### Overt Acts

4.      In furtherance of the conspiracy and to effect the illegal object thereof, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and others known and unknown, committed the following overt acts, among others:

a.      On or about January 21, 2012, several co-conspirators not named herein abducted an individual who is a dual citizen of the United States and another country (the "U.S. Victim") in Galkayo, Somalia.

b.      In or around February 2012, MOHAMED arrived at the encampment where the U.S. Victim was being held in the vicinity of Hobyo, Somalia.

c.      Between in or around February and in or around April 2012, MOHAMED issued directions to guards holding the U.S. Victim captive, who were armed with automatic rifles and handguns.

d.      In or around early March 2012, MOHAMED helped escort the U.S. Victim from one location to another while carrying an automatic rifle.

e.      In or about May 2012, while the U.S. Victim was being held hostage on board a hijacked vessel off the coast of Somalia (the "Vessel"), MOHAMED boarded the Vessel.

(Title 18, United States Code, Sections 1201(c) and 3238.)

## COUNT THREE: HOSTAGE-TAKING

5.      From in or about January 2012, up to and including in or around May 2012, in an offense begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, willfully and knowingly did seize, detain, and threaten to kill, injure, and continue to detain other another person, namely, a national of the United States, and aided and abetted the same, in order to compel a third person and a governmental organization to do and abstain from doing an act as an explicit and implicit condition for the release of the person detained, to wit, the defendant and others known and unknown seized, detained and threatened to kill, injure, and continued to detain a citizen of the United States in order to compel family members of the victim and the governments of the United States and another country to pay a ransom and to compel the government of the United States to promise not to retaliate against the kidnappers.

(Title 18, United States Code, Sections 1203(a) & (b)(1), 3238 and 2.)

## COUNT FOUR: HOSTAGE-TAKING CONSPIRACY

6.      From in or about January 2012, up to and including in or about September 2014, in an offense begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, willfully and knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 1203(a).

7.      It was a part and an object of the conspiracy that MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and others known and unknown, would and did seize, detain and threaten to kill, injure, and continue to detain another person, namely, a national of the United States, in order to compel a third person and a governmental organization to do and abstain from doing an act as an explicit and implicit condition for the release of the person detained.

### Overt Acts

8.    In furtherance of the conspiracy and to effect the illegal object thereof, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and others known and unknown, committed the overt acts set forth in paragraph four, among others, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 1203(a) & (b)(1), and 3238.)

### COUNT FIVE:   POSSESSION OF A FIREARM

9.    From in or about January 2012, up to and including in or about May 2012, in an offense occurring in and affecting interstate and foreign commerce, and begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, knowingly, did use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, and, in furtherance of such crime, did possess a firearm, and aided and abetted the same, to wit, the defendant possessed and aided and abetted the possession of an AK-47 in furtherance of the offenses charged in Counts One through Four of this Complaint.

(Title 18, United States Code, Sections 924(c)(1)(A), 2, and 3238.)

### COUNT SIX: CONSPIRACY TO POSSESS A FIREARM

10.    From in or about January 2012, up to and including in or about May 2012, in an offense occurring in and affecting interstate and foreign commerce, and begun and committed in Somalia and elsewhere out of the jurisdiction of any particular State or district of the United States, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, who will be first brought to and arrested in the Southern District of New York, and others known and unknown, knowingly did combine, conspire, confederate and agree together and with each other to violate Title 18, United States Code, Section 924(c).

11.    It was a part and an object of the conspiracy that MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and others known and unknown, would and did use and carry a firearm during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, and, in furtherance of such crime, did possess a firearm, to wit, various co-conspirators not named herein possessed destructive devices, to wit, rocket-propelled grenade launchers, semiautomatic assault weapons and

machineguns, to wit, AK-47s, in furtherance of the offenses charged in Counts One through Four of this Complaint.

## Overt Acts

12.     In furtherance of the conspiracy and to effect the illegal object thereof, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and others known and unknown, committed the overt acts set forth in paragraphs 4(c) and 4(d) of Count Two of this Complaint, among others, which are fully incorporated by reference herein.

(Title 18, United States Code, Sections 924(o) and 3238.)

The bases for my knowledge and the foregoing charges are as follows:

13.     I am an FBI agent with over 16 years' experience.   I have participated in the investigation of this matter, and have spoken with other individuals, including federal agents, other law enforcement officials, and other witnesses.   When I rely on statements made by others, such statements are related in sum and substance unless otherwise indicated.   Moreover, because this affidavit is submitted for the limited purpose of establishing probable cause supporting the arrest of the defendant, I have not set forth each and every fact learned during the course of this investigation.

## The Investigation

14.     Based on my conversations with the U.S. Victim, and review of official records, I have learned that the U.S. Victim is a dual citizen of the United States and another country ("Country-1").

15.     According to the U.S. Victim and other witnesses who were present, on or about January 21, 2012, the U.S. Victim, a freelance journalist, was abducted in the vicinity of Galkayo, Somalia by a group of heavily-armed men carrying what appeared to be AK-47 assault rifles.

16.     From my conversations with the U.S. Victim, I know that the U.S. Victim was taken to a different area in Somalia where he/she was held in various locations along with two hostages from a foreign nation ("Foreign Victim-1" and "Foreign Victim-2"; collectively, the "Foreign Victims"), who had been abducted from a fishing vessel off the coast of Somalia in or about October 2011.

17.     Based on my participation in this investigation, including my conversations with Foreign Victim-1 and the U.S. Victim, I know that the Foreign Victims were released from custody in or about November 2012, and that the U.S. Victim was released from custody on or about September 23, 2014.

18.     Following his/her release from custody, the U.S. Victim was interviewed by FBI agents.   Based on my participation in those interviews, my review of reports of those interviews, and subsequent interviews of the U.S. Victim, I know that the U.S. Victim stated, in substance and in part:

a.     On or about January 21, 2012, in the vicinity of Galkayo, Somalia, a group of heavily-armed men carrying what appeared to be AK-47 assault rifles and other weapons, including a rocket-propelled grenade launcher, surrounded the U.S. Victim, who was in a vehicle at the time.   The U.S. Victim was pulled out of his/her vehicle by some of the men and was struck by one or more of the firearms being carried by the men, causing injuries to the U.S. Victim's head and wrist.

b.     During the time period when the U.S. Victim and Foreign Victim-1 were held in captivity, including the time period from in or about January 2012 through in or about May 2012, they were typically guarded by approximately 10 men, all of whom were armed with what appeared to be AK-47 assault rifles and some of whom had belt-fed machine guns.

c.     In or about February 2012, while the U.S. Victim and the Foreign Victims were being held captive on land, an individual who identified himself to the U.S. Victim as "Mohamed," and who was later identified as MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, joined the group holding the U.S. Victim and Foreign Victims captive.

d.     Shortly after his arrival, MOHAMED introduced himself to the U.S. Victim and informed the U.S. Victim that another individual ("CC-1") was the person immediately in charge of the U.S. Victim's captivity.   MOHAMED was present at numerous locations where the U.S. Victim was held from in or about February 2012 until in or about April 2012, when the U.S. Victim and Foreign Victim-1 were transferred to the Vessel.

e.     From in or about February 2012 through in or about April 2012, MOHAMED routinely gave commands to the armed men who were guarding the U.S. Victim. On several occasions, the same guards who had received commands from MOHAMED also warned the U.S. Victim of dire consequences if ransom payments were not forthcoming.

f.     In or around February and March 2012, while MOHAMED was guarding the house where the U.S. Victim was being held captive, the U.S. Victim routinely saw MOHAMED carry an AK-47, including on at least one occasion when MOHAMED helped escort the U.S. Victim from one location to another.   During the time period while MOHAMED was guarding the U.S. Victim, MOHAMED also showed the U.S. Victim a grenade launcher, which MOHAMED identified as "American."   MOHAMED showed the U.S. Victim what appeared to be grenades for the launcher and stated that the weapon had considerable range.

g.      In or about April 2012, while the U.S. Victim was being held captive on the Vessel, the U.S. Victim witnessed MOHAMED on board the Vessel for several days. During the time the U.S. Victim saw MOHAMED on board the vessel, the U.S. Victim also witnessed numerous other foreign individuals being held captive on board the Vessel, including Foreign Victim-1. Also on board the Vessel during that time period were approximately 30 armed guards. Among the weapons carried by the guards were what appeared to be rocket-propelled grenade launchers, AK-47 assault rifles, and various handguns.

h.      In or about May 2012, the U.S. Victim and Foreign Victim-1 were transferred from the Vessel back to land and were taken to an inland location, where the U.S. Victim observed Foreign Victim-1 being hung upside down from a tree and being beaten by other co-conspirators not named herein. One of the co-conspirators not named herein ("CC-2") told the U.S. Victim that if the ransom for the U.S. Victim's release was not paid, the U.S. Victim would be sold to al Shabaab, a terrorist organization operating in Somalia.

i.      Except for a period of a few days in or about May 2012 when they were brought back to land, the U.S. Victim and Foreign Victim-1 remained in custody together on the Vessel with the other crew members of the Vessel until in or about August 2012, when the U.S. Victim was transferred back to land. The U.S. Victim did not see MOHAMED after returning to land from the Vessel.

20.      During the U.S. Victim's captivity from in or about January 2012 through in or about September 2014, numerous ransom calls/proof-of-life calls were placed to a family member of the U.S. Victim in the United States (the "Family Member"), which were consensually recorded by the FBI. In addition, several proof-of-life videos showing the U.S. Victim speaking on camera were obtained by the FBI. During many of these calls and videos, the U.S. Victim relayed the kidnappers' ransom demands to the Family Member. Some of these calls and videos are summarized below:

a.      On or about January 30, 2012, the Family Member received a ransom call, during which the U.S. Victim told the Family Member, among other things, that he/she was in Somalia, that the people holding him/her were demanding $20 million for his/her release, and that if they did not receive the money within 24 hours, they would stop providing food and water to the U.S. Victim. The U.S. Victim also stated that any action by the United States military would be held against him/her.

b.      On or about February 26, 2012, the Family Member received a ransom call, during which the U.S. Victim, among other things, relayed a demand by the kidnappers for a letter signed by a high-ranking U.S government official (the "U.S. Government Official") absolving them of any consequences for the kidnapping, and that without the letter, there would be no progress in the negotiations.

c.      On or about March 15, 2012, the Family Member received a ransom call, during which the U.S. Victim stated, among other things, that an individual named "Mohamed" was the "negotiator" and that "Mohamed" was upset that no one had contacted him about the

7

letter from the U.S. Government Official.   The U.S. Victim further stated that "Mohamed" needed the letter "immediately" and if he did not receive it, he would not take responsibility for any harm to the U.S. Victim that might result.   The U.S. Victim further stated that the letter should say that "Mohamed" is the negotiator for the U.S. Victim, and that the kidnappers would be forgiven by the U.S. government.[1]   The U.S. Victim also reiterated the demand for the ransom payment.

        d.      On or about March 16, 2012, the Family Member received a ransom call, during which the U.S. Victim provided the Family Member with an e-mail address where the letter from the U.S. Government Official should be sent and which should be used for future negotiations.   The U.S. Victim further stated that the letter would enable "Mohamed" to be the negotiator on behalf of two different groups involved in the kidnapping.

        e.      On or about May 8, 2012, the Family Member received two ransom calls, during which the U.S. Victim stated, among other things that the kidnappers had "just made a video" and were demanding the full $20 million ransom.   The U.S. Victim further stated that things had "gotten very serious" and that "another hostage" had been "beaten very severely." The U.S. Victim reiterated to the Family Member in a foreign language that they both speak that the kidnappers had "tortured a hostage today, right in front of [him/her]."   The U.S. Victim then stated that the threat was "very real" and that if the kidnappers did not get an answer in three days regarding their ransom demand, he/she would be "in a lot of trouble" and they would sell him/her to al Shabaab.

        f.      On or about May 20, 2012, the kidnappers released a proof-of-life video of the U.S. Victim.   The video depicts the U.S. Victim in an undisclosed location with a prayer shawl draped over his/her head and surrounded by masked, armed kidnappers.   One of the kidnappers appears to be holding a belt-fed automatic machine gun and another appears to be holding a rocket-propelled grenade launcher, both of which are pointed at the U.S. Victim throughout the video.   During the video, the U.S. Victim stated, among other things, that the kidnappers were demanding that the governments of the United States and another country ("Country-2") pay the full ransom within three days or the kidnappers would "sell [him/her] to al Shabaab."

    21.     Following the U.S. Victim's release in September 2014, the U.S. Victim resumed using a personal Facebook account, which is public and visible to other Facebook users.   In or about early November 2014, the U.S. Victim began to receive Facebook messages from an individual whose Facebook page listed "Maxamed Tahliil Guure" as the name associated with the account.   The Facebook page also contained a photograph of the individual purported to be associated with the account, whom the U.S. Victim recognized as the person who had previously identified himself as "Mohamed" during the U.S. Victim's captivity in Somalia, *see supra* ¶ 18(c)-(i)—that is, MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a

---

[1]  Based on my involvement in this investigation, including my interviews with the U.S. Victim following his/her release, I believe that the "Mohamed" referred to in this call and the call referenced in paragraph 20(d), *infra*, was in fact CC-2.

"Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant.

22.     From my review of the Facebook communications between the U.S. Victim and MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and from my communications with the U.S. Victim, I have learned the following:[2]

        a.      On or about November 18, 2014, MOHAMED wrote to the U.S. Victim, stating, "How are you [first name of the U.S. Victim]. I am ur friend Mohammed Tahlil. I wants to speak with u. I am at Hobyo. I hope u are fine. The pirates who held u hostage killed each other over group vendetta and money issues.."[3]    The U.S. Victim responded to MOHAMED, informing MOHAMED that he/she remembered him.

        b.      In the months that followed his initial communication with the U.S. Victim, MOHAMED sent the U.S. Victim numerous photographs of individuals.    In several instances, MOHAMED described to the U.S. Victim the role that the individuals played in the U.S. Victim's kidnapping.    For example, in a Facebook message to the U.S. Victim on or about February 7, 2015, MOHAMED included in his message a photograph of an individual whom MOHAMED referred to as "abdi ganey."    MOHAMED stated, in substance and in part, that "ganey" was the man who broke the U.S. Victim's hand when the U.S. Victim was originally captured.    On or about September 14, 2015, MOHAMED sent the U.S. Victim photographs of an individual he identified as "samiir xasan aadan," whom MOHAMED indicated had been responsible for handling media activities for Somali pirates.    In the message, MOHAMED informed the U.S. Victim that this individual had relocated to Europe.

        c.      The U.S. Victim recognized several photographs sent to him by MOHAMED as depicting individuals whom the U.S. Victim recalls holding him captive.    For example, the U.S. Victim identified one of the individuals in the photographs as a man who was in charge of the guards and hostages while the U.S. Victim was being held on the Vessel.    The U.S. Victim also recognized, among others, two individuals who had served as guards over the U.S. Victim during much of his/her captivity.

        d.      On or about December 30, 2014, in a Facebook exchange with the U.S. Victim, MOHAMED told the U.S. victim, in substance and in part, that they had met at one of

---

[2] Some of MOHAMED's communications with the U.S. Victim have been in broken English. Others have been in Somali, and were translated by the U.S. Victim in the first instance using a public online translation service.    Any language that appears in quotation marks herein was either written in English or translated by an FBI interpreter who has prepared draft translations or summaries of some of the U.S. Victim's communications with MOHAMED.

[3] I know from reviewing open source reports surrounding the release of the U.S. Victim that MOHAMED's account is consistent with reports that several of the U.S. Victim's captors were killed in a dispute over how to divide the U.S. Victim's ransom.

the locations where the U.S. Victim was being held in custody.   MOHAMED stated that, at the time, the U.S. Victim had a "broken hand" and had requested MOHAMED to obtain medicine for the U.S. Victim.   MOHAMED recounted how, during the U.S. Victim's captivity, he had assisted the U.S. Victim by providing him with a radio, books and pens, and other items. MOHAMED asked the U.S. Victim whether the U.S. Victim remembered his face.   The U.S. Victim replied, "Yes, I thought so. The men called you 'Talia Mohammed.' I remember. You also brought me a little bottle of medicine from Hobyo to the ship.   All you wanted was a box of biscuits in return. I remember."   Tahlil replied, "Yes me talia mahamed."

e.      On or about July 12, 2015, MOHAMED sent the U.S. Victim, via Facebook, an image of what appeared to be a Somali passport, which contained a photograph of MOHAMED.   The name on the passport was "Mohamed Tahlil Mohamed."

f.      In or around February 2015, MOHAMED advised the U.S. Victim that MOHAMED had received $500 from the ransom that had been paid for the U.S. Victim's release.   MOHAMED informed the U.S. Victim this in the context of informing the U.S. Victim of his financial difficulties in Somalia.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for MOHAMED TAHLIL MOHAMED, a/k/a "Tahlil Mohamed," a/k/a "Mohamed Tahlil," a/k/a "Maxamed Tahliil Guure," a/k/a "the Taliye," a/k/a "Mohamed the Taliye," the defendant, and that he be arrested and imprisoned, or bailed, as the case may be.


KEVIN PONDER
Special Agent
Federal Bureau of Investigation


Sworn to before me this
1st day of March 2016


THE HONORABLE DEBRA FREEMAN
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK